UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
    Plaintiff,                     )
                                   )
v.                                 )
                                   )    No. 4:22-CR-297 SRC
JOHN COLLINS-MUHAMMAD,             )
                                   )
    Defendant.                     )

## GUILTY PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

### 1. PARTIES:

The parties are the defendant John Collins-Muhammad, represented by defense counsel Matthew Radefeld and Joseph Flees, and the United States of America (hereinafter "United States" or "Government"), represented by Assistant United States Attorney Hal Goldsmith and the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

### 2. GUILTY PLEA:

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the defendant's voluntary plea of guilty to counts One, Three, and Five of the Indictment, the United States agrees that no further federal prosecution will be brought in this District relative to the

defendant's criminal conduct as set forth in the Indictment, of which the Government is aware at this time.

In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties further agree that either party may request a sentence above or below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines and Title 18, United States Code, Section 3553(a). The parties further agree that notice of any such request will be given no later than ten days prior to sentencing and that said notice shall specify the legal and factual bases for the request.

## 3. ELEMENTS:

As to Count One of the Indictment, the defendant admits to knowingly violating Title 18, United States Code, Section 666(a)(1)(B), and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

1.   Defendant was an agent of the City of St. Louis, Missouri;

2.   During each one-year period covered by the Indictment, defendant accepted and agreed to accept something of value from "John Doe" in connection with pending and proposed business and transactions with the City of St. Louis, including, but not limited to, business and transactions related to "John Doe's" Project A;

3.   The business and transactions related to "John Doe's" Project A involved something of a value of $5,000 or more; and,

4.   The City of St. Louis, Missouri received federal program benefits in excess of $10,000 during each of the one-year periods covered by in the Indictment.

2

As to Count Three of the Indictment, the defendant admits to knowingly violating Title 18, United States Code, Section 1952(a)(3), and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

1.  Defendant used a cellular telephone in interstate commerce;

2.  Defendant did so with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, that is Acceding to Corruption and Official Misconduct in violation of Missouri Revised Statutes, and the prohibition against receiving private gain and gifts in violation of the St. Louis City Code of Ordinances; and,

3.  Defendant knowingly committed an act or acts in performing or attempting to perform the unlawful activity.

As to Count Five of the Indictment, the defendant admits to knowingly violating Title 18, United States Code, Sections 1343 and 1346, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

1.  The defendant voluntarily and intentionally devised and participated in a scheme to defraud the citizens of St. Louis City, Missouri of their right to his honest services through bribery, which scheme to defraud is described as follows: defendant used his official position as a St. Louis City Alderman to enrich himself through soliciting and accepting cash payments and campaign contributions from an individual in exchange for favorable official action, which potentially enriched that individual by obtaining favorable action for himself, through corrupt means;

2.  The defendant did so with the intent to defraud;

3.  The scheme to defraud involved fraudulent and false material pretenses, statements, representations, and concealment of fact; and

4.  The defendant used, caused to be used, or aided and abetted the use of the interstate wires in furtherance of, or in an attempt to carry out, some essential step in the scheme.

3

## 4. **FACTS:**

The parties agree that the facts in this case are as follows and that the government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

1. The City of St. Louis, Missouri was a governmental entity that received federal assistance in excess of $10,000 during each of calendar years 2020, 2021, and 2022, as covered by the Indictment.

2. The St. Louis Board of Aldermen (hereinafter referred to as the "Board of Aldermen") was the legislative branch of St. Louis city government, and legislative authority in the city was vested in its twenty- eight members. It was a primary function of the Board of Aldermen to enact Ordinances through the passage of Board Bills relating to city services, the licensing and regulating of businesses, and other municipal activities including real estate property Tax Abatements. It was one of the functions of Aldermen to issue Letters of Support that communicated support for real estate development projects proposed for land located in their respective Wards, as well as real estate property Tax Abatements for those projects, which letters were instrumental in securing governmental action or inaction relating to the proposed projects.

3. Section 576.020 of the Missouri Revised Statutes made it a felony crime for any public servant, including a St. Louis City Alderman, to knowingly accept or agree to accept any benefit, direct or indirect, in return for his official vote, opinion, recommendation, judgment, decision, action or exercise of discretion as a public servant. Section 576.040 of the Missouri Revised Statutes made it a misdemeanor crime for any public servant, including a St. Louis City Alderman, in such person's public capacity or under color of such person's office or employment,

4

to knowingly receive any fee or reward for the execution of any official act or the performance of a duty imposed by law or by the terms of his employment, that is not due.

4. Section 4.02.010 of the St. Louis City Code of Ordinances, which applied to St. Louis City Aldermen, stated in part, that: "No officer or employee shall, for private gain, grant any special consideration, treatment or advantage to any person. Nor shall any officer solicit or accept any payment or gift of money or any other thing of value for any service performed in his official capacity nor for the doing of any act which he is required by law to do."

5. The St. Louis Development Corporation (hereinafter referred to as "SLDC") was the economic development agency of the City of St. Louis. The Land Clearance Redevelopment Authority (hereinafter referred to as "LCRA"), a department of the SLDC, oversaw many aspects of public and private real estate development in the City of St. Louis. One of the primary functions of LCRA was to review development proposals that included requests for public assistance in the form of Tax Abatement. The Land Reutilization Authority (hereinafter referred to as "LRA"), also a department of the SLDC, owned and maintained vacant land and buildings in the City of St. Louis for sale. One of the primary functions of LRA was to review purchase offers for city owned land and to enter into agreements for the sale of city owned land.

6. Real estate Tax Abatement is a development tool designed to assist businesses with renovation and new construction projects. Tax Abatement freezes the tax assessment in improvements to property at the pre-development level. In the City of St. Louis, it was necessary that a business owner seeking Tax Abatement for a planned development obtain the support of the Alderman of the Ward in which the development was proposed. A Letter of Support from the

5

Alderman was required for both the SLDC and the Board of Aldermen to approve development plans and Tax Abatements within a particular Alderman's Ward.

7.     Defendant **JOHN COLLINS-MUHAMMAD**, Alderman for the 21st Ward, was publicly elected, was an employee and agent of the City of St. Louis, and was paid a salary by the City of St. Louis. His duties included representing and assisting the residents of the 21st Ward and the City of St. Louis. He was first elected during 2017, and re-elected during 2021. In his position, he owed the citizens of his Ward and of the City of St. Louis his honest services.

8.     Co-Defendant Lewis Reed, President of the St. Louis Board of Aldermen, was publicly elected, was an employee and agent of the City of St. Louis, and was paid a salary by the City of St. Louis. His duties included representing and assisting the residents of the City of St. Louis, and presiding over the Board of Aldermen. He was first elected during 2007, and re-elected during 2011, 2015, and 2019. He previously served as the elected 6th Ward Alderman, having first been elected during 1999. As President of the Board of Aldermen, he also served on the City's Board of Estimate and Apportionment, along with the Mayor and the Comptroller.

9.     Co-Defendant Jeffrey Boyd, Alderman for the 22nd Ward, was publicly elected, was an employee and agent of the City of St. Louis, and was paid a salary by the City of St. Louis. His duties included representing and assisting the residents of the 22nd Ward and the City of St. Louis. He also served as the Chairperson of the Aldermanic Housing, Urban Development and Zoning Committee (hereinafter referred to as "HUDZ"). He was first elected Alderman during 2003, and re-elected during 2007, 2011, 2015 and 2019.

6

10.    An individual (hereinafter referred to as "John Doe") was the owner and operator of several small businesses located in both the City of St. Louis and St. Louis County. John Doe owned vacant property in defendant **JOHN COLLINS-MUHAMMAD's** 21st Ward which he planned to develop with construction of a gas station/convenience store. John Doe sought property Tax Abatement for that planned development and needed **JOHN COLLINS-MUHAMMAD's** support and Board of Aldermen approval for his desired property Tax Abatement. Further, John Doe sought to purchase and redevelop a commercial property owned by the City in co-defendant Jeffrey Boyd's 22nd Ward, and sought Boyd's assistance in obtaining LRA approval to purchase and redevelop the property, as well as Boyd's assistance in obtaining Board of Alderman approval for a property Tax Abatement for the planned redevelopment.

11.    On January 18, 2020, John Doe requested **JOHN COLLINS-MUHAMMAD's** help and assistance in obtaining a property Tax Abatement for his planned gas station/convenience store development in the 21st Ward, (hereinafter referred to as "Project A"). **COLLINS-MUHAMMAD** assured John Doe that he would take the necessary steps to obtain the requested Tax Abatement, "Apply and I got you. I can take care of you in my Ward…I can do a 10 year Abatement…."

12.    On January 21, 2020, **JOHN COLLINS-MUHAMMAD** provided John Doe with his Aldermanic Letter of Support for a ten-year property Tax Abatement for Project A. The Letter of Support provided the SLDC with **JOHN COLLINS-MUHAMMAD's** "…support and permission to grant real estate tax abatement…." to John Doe's company for Project A. **JOHN COLLINS-MUHAMMAD** also provided John Doe with the name of the SLDC employee to whom John Doe was to submit the Aldermanic Letter of Support and supporting paperwork in

7

order to obtain approval for the development plan and the promised Tax Abatement (hereinafter referred to as "Z.W." who was the SLDC Project Manager overseeing development initiatives). **JOHN COLLINS-MUHAMMAD** also provided John Doe with the partially prepared application for Tax Abatement which he directed John Doe to complete in order to provide to the SLDC in support of the promised Tax Abatement.

13.     On January 24, 2020, **JOHN COLLINS-MUHAMMAD** met with John Doe at John Doe's business where the two discussed the promised Tax Abatement. During the meeting, John Doe asked **JOHN COLLINS-MUHAMMAD** what he owed him for his Aldermanic Letter of Support and help in obtaining the Tax Abatement, and **COLLINS-MUHAMMAD** replied, "25." Later that same afternoon, **COLLINS-MUHAMMAD** returned and accepted $2,500 cash from John Doe in exchange for his continued agreement, assistance, and use of his official position to provide the property Tax Abatement for John Doe's Project A.

14.     On January 31, 2020, **JOHN COLLINS-MUHAMMAD** obtained the completed Tax Abatement Application from John Doe, and submitted it to SLDC for review and approval.

15.     On May 1, 2020, the SLDC requested additional information from John Doe concerning the Tax Abatement Application for Project A. John Doe received an additional form to complete regarding the Tax Abatement Application. John Doe discussed the required additional information and form with **JOHN COLLINS-MUHAMMAD** on May 12, 2020, and John Doe gave an additional $1,000 cash to **JOHN COLLINS-MUHAMMAD** in exchange for his continued agreement, assistance and use of his official position to provide the property Tax Abatement for John Doe's Project A. **COLLINS-MUHAMMAD** told John Doe that he would obtain a fifteen year Tax Abatement for Project A, "Then we'll make it 15."

8

16.     On June 17, 2020, **JOHN COLLINS-MUHAMMAD** and John Doe discussed a public official (hereinafter referred to as "Public Official One") who **JOHN COLLINS-MUHAMMAD** claimed could obtain government contracts for John Doe's trucking and hauling company. The two agreed to split any profits from government contracts John Doe obtained through Public Official One's assistance. **JOHN COLLINS-MUHAMMAD** advised John Doe that he would bring Public Official One to John Doe's business for a meeting the next day. **JOHN COLLINS-MUHAMMAD** advised that John Doe should give a cash bribe to Public Official One:

John Doe: "Should I throw him something?"

**COLLINS-MUHAMMAD**: " Fuck yeah, you should throw him something. Yeah, you should throw him something."

John Doe: "OK."

**COLLINS-MUHAMMAD**: "If you don't throw him something, he'll never come back."

John Doe: "No, I'll throw him something."

**COLLINS-MUHAMMAD**: "Throw him something."

John Doe: "Should I give him 10 ( $10,000)?"

**COLLINS-MUHAMMAD**: "10 is good."

John Doe: "10,000."

**COLLINS-MUHAMMAD**: "10 is good."

John Doe: "I'll give it to him tomorrow. I'll have 10 for him and I'll have, how much for you, John?"

**COLLINS-MUHAMMAD**: "Whatever you give me, me and you have a relationship."

9

17.    On June 18, 2020, **JOHN COLLINS-MUHAMMAD** introduced John Doe to Public Official One at John Doe's business.  During the meeting, they discussed obtaining government contracts for John Doe's trucking and hauling company and, as directed by **JOHN COLLINS-MUHAMMAD,** John Doe provided Public Official One $10,000 cash in exchange for Public Official One's agreement, assistance, and use of his official position to provide government contracts for John Doe's trucking and hauling company.  Following that meeting, John Doe paid **JOHN COLLINS-MUHAMMAD** $3,000 cash for setting up the meeting. Shortly after the meeting, Public Official One returned to John Doe's business and gave **JOHN COLLINS-MUHAMMAD** the $10,000 cash from John Doe.  Public Official One directed **JOHN COLLINS-MUHAMMAD** to have John Doe write two checks, each for $5,000, to Public Official One's Political Action Committee account, instead of the cash.  John Doe then gave **JOHN COLLINS-MUHAMMAD** the two $5,000 checks, which **COLLINS-MUHAMMAD** and John Doe then delivered to Public Official One's close associate.  On June 27, 2020, **JOHN COLLINS-MUHAMMAD** told John Doe that Public Official One had requested an additional $2,500 cash, "[Public Official One], he wants $2,500…he just told me to ask…he asked for cash."  On June 29, 2020, John Doe provided $2,500 cash to **JOHN COLLINS-MUHAMMAD** who advised that he would pass the cash to Public Official One's close associate.    John Doe never received the promised government contracts for his trucking/hauling company, and the two $5,000 checks were never cashed or deposited.  Further, on July 3, 2020, **JOHN COLLINS-MUHAMMAD** used the $2,500 cash he had received from John Doe to purchase a 2008 Chevrolet Trailblazer automobile for his own personal use.

18.     During July, 2020, **JOHN COLLINS-MUHAMMAD** also requested a car from John Doe. John Doe provided **JOHN COLLINS-MUHAMMAD** with a 2016 Volkswagen CC sedan, outfitted with a Missouri dealer's license plate. **JOHN COLLINS-MUHAMMAD** did not pay John Doe for the car, and John Doe provided the car free of charge in exchange for **JOHN COLLINS-MUHAMMAD's** continued agreement, assistance and use of his official position to provide the promised Tax Abatement for Project A.

19.     Also, during July, 2020, **JOHN COLLINS-MUHAMMAD** introduced John Doe to co-defendant Jeffrey Boyd in order for John Doe to obtain Boyd's assistance in the purchase and development of property located in Boyd's Ward, referred to as "Project B." During their first meeting with Boyd, as **COLLINS-MUHAMMAD** had directed John Doe, John Doe gave $2,500 cash to Boyd in order to obtain his support and assistance regarding Project B. John Doe also gave **COLLINS-MUHAMMAD** $1,000 cash for setting up the meeting with Boyd.

20.     On August 27, 2020, Z.W. advised John Doe that the SLDC Board had approved and recommended the property Tax Abatement for Project A, and that it had been sent to the St. Louis Board of Aldermen for its approval.

21.     Following SLDC's approval, on September 18, 2020, **JOHN COLLINS-MUHAMMAD** took legislative action and submitted Board Bill Number 108 to the Board of Aldermen. That Board Bill provided Aldermanic approval for the redevelopment plan and Tax Abatement for Project A. On November 2, 2020, **JOHN COLLINS-MUHAMMAD** requested another St. Louis Alderman who, at that time, served as the Chairperson of the Board of Alderman Neighborhood Development Committee, to "hold a committee hearing so I can get the Board Bill out for tax abatement. Bb 108." On November 24, 2020, at **JOHN COLLINS-MUHAMMAD's**

11

request, the Neighborhood Development Committee did in fact hold a hearing on Board Bill Number 108. **JOHN COLLINS-MUHAMMAD** appeared during the hearing, used his official authority and influence and spoke in favor of the Board Bill. Board Bill Number 108 passed out of that Committee with no objections.

22.     On December 4, 2020, **JOHN COLLINS-MUHAMMAD's** Board Bill Number 108 had its second reading before the Board of Aldermen. On December 11, 2020, **JOHN COLLINS-MUHAMMAD's** Board Bill Number 108 was perfected by the Board of Aldermen.

23.     On December 24, 2020, **JOHN COLLINS-MUHAMMAD** appeared in his official capacity as Alderman of the 21st Ward at a St. Louis City Board of Public Service hearing. During the hearing, **COLLINS-MUHAMMAD** used his official authority and influence and spoke in support of a conditional use construction permit for John Doe's Project A. The Board of Public Service issued the permit on January 8, 2021, Permit Number 128976.

24.     On December 27, 2020, John Doe met with **JOHN COLLINS-MUHAMMAD** and discussed John Doe's Project A. John Doe provided **COLLINS-MUHAMMAD** a new Apple iPhone 11, free of charge, in exchange for **COLLINS-MUHAMMAD's** continued agreement, support and use of his official position to provide a property Tax Abatement for John Doe's Project A.

25.     Residents of **JOHN COLLINS-MUHAMMAD's** Ward learned of Project A and the proposed Tax Abatement and, during in or about January, 2021, these residents raised concerns, complaints and strong opposition to the planned development and Tax Abatement with **JOHN COLLINS-MUHAMMAD**. Without telling John Doe, on January 14, 2021, **JOHN COLLINS-MUHAMMAD** responded to the residents' complaints by advising the residents that

12

he would effectively remove the Tax Abatement Bill from further consideration by the Board of Aldermen:

> "...I will make a motion to send Board Bill 108 back to Committee, which it would be referred back to the Committee on Neighborhood Development, from where it was heard and passed out of initially. Upon sending the Board Bill back to Committee, I will then make the motion to place Board Bill 108 on the informal calendar, which is where we place bills to die and not to be perfected and finally passed. Doing this, will halt the project...I want to make this very clear – I will not support something or do something that residents are in great disagreement with."

On January 15, 2021, **JOHN COLLINS-MUHAMMAD** did, in fact, place Board Bill Number 108 on the Board of Alderman Informal Calendar, and the Board Bill did not move to a required third reading and final passage by the Board of Aldermen. **JOHN COLLINS-MUHAMMAD** did not tell John Doe that he had pulled the promised Tax Abatement, Board Bill Number 108, from consideration by the Board of Aldermen.

26. Between December, 2020 and February, 2021, John Doe gave **JOHN COLLINS-MUHAMMAD** $3,000 in campaign contributions in exchange for his continued agreement, assistance, and use of his official position to provide the property Tax Abatement for John Doe's Project A. **COLLINS-MUHAMMAD** used those "campaign contributions" for his own personal use, unrelated to any political campaign efforts. During the next several months, **JOHN COLLINS-MUHAMMAD** made repeated false representations to John Doe that Board Bill Number 108 was still moving forward in the Board of Aldermen.

27. On May 11, 2021, Z.W. advised John Doe that Board Bill Number 108 had not, in fact, been passed by the Board of Aldermen, and that it would have to be re-introduced in order to obtain the promised Tax Abatement. John Doe then communicated with **JOHN COLLINS-MUHAMMAD**, who responded to John Doe via text message that:

"...I have to re-introduce the entire board bill. Which is easy. Just change the dates on the one I already introduced. We go back to committee now....DON'T START CONSTRUCTION UNTIL THIS PASSES! Otherwise taxes are going to be high."

John Doe then spoke with **JOHN COLLINS-MUHAMMAD**.

John Doe: "You know, I got the construction permit for the site."

**COLLINS-MUHAMMAD**: "I know. So I need you to wait two, three weeks tops. Like I have to reintroduce this, I have to get it past committee again and then I have to go back for a third reading. If you start construction now, like if you start tomorrow, that's gonna be the taxes, if we don't get the Abatement through. Do not pay higher taxes on this property."

John Doe: "I got you. Even if I do the foundation?"

**COLLINS-MUHAMMAD**: "Do not start yet."

. . . . .

John Doe: "We can wait, if it's gonna be 2 or 3 weeks."

. . . . .

**COLLINS-MUHAMMAD**: "You're gonna end up paying 26, $27,000 (property taxes)."

John Doe: "I know. I know."

**COLLINS-MUHAMMAD**: "Fuck that. Fuck that. We don't want that."

John Doe: "That's right. That's right.

28.     On May 12, 2021, **JOHN COLLINS-MUHAMMAD** met with John Doe at John Doe's business. **JOHN COLLINS-MUHAMMAD** advised John Doe that he would introduce a new Board Bill to get John Doe's Project A Tax Abatement and it would be passed by June 11, 2021. John Doe then gave $1,000 cash to **JOHN COLLINS-MUHAMMAD** for his continued agreement, support and use of his official position to provide a Tax Abatement for Project A, telling **JOHN COLLINS-MUHAMMAD**, "Here's $1,000, get it done, I'll have a nice package for you." **JOHN COLLINS-MUHAMMAD** readily accepted the $1,000, and responded, "you always do." **JOHN COLLINS-MUHAMMAD** also told John Doe that if necessary, he could

14

extend the construction permit so that John Doe could hold off construction on the planned development until the Tax Abatement was passed by the Board of Aldermen.

29.     On May 18, 2021, **JOHN COLLINS-MUHAMMAD** sent a text message to John Doe:

> "New Board Bill being introduced this coming Friday for tax abatement in scattered sites within my Ward. We're good!"

30.     On May 27, 2021, **JOHN COLLINS-MUHAMMAD** took legislative action and introduced Board Bill Number 42 to the Board of Aldermen. Board Bill Number 42 provided Aldermanic approval for the development plan and Tax Abatement for Project A. In order to conceal from the concerned residents of his Ward the fact that he had submitted this new Board Bill, **JOHN COLLINS-MUHAMMAD** titled Board Bill Number 42 as if it was aimed at "scattered areas" in his Ward, when, in fact, the only property identified within the Board Bill for development and Tax Abatement was John Doe's Project A. Board Bill Number 42 was referred to the Aldermanic Neighborhood Development Committee, and a hearing before that Committee was scheduled for June 29, 2021. On June 29, 2021, the Neighborhood Development Committee did hold a hearing on Board Bill Number 42. **JOHN COLLINS-MUHAMMAD** appeared at that hearing and used his official authority and influence to request that Board Bill Number 42 be "tabled," and not discussed by the committee at that time. **JOHN COLLINS-MUHAMMAD** further advised the Committee that he had submitted a different Board Bill, Board Bill Number 63, which he stated included the same property covered by Board Bill Number 42 (John Doe's Project A property), along with a larger portion of his Ward. Board Bill Number 42, therefore, was not considered by the Committee, and did not move forward through the Board of Aldermen for approval. **JOHN COLLINS-MUHAMMAD** did not tell John Doe that he had pulled Board

15

Bill Number 42. Instead, following the Committee meeting, **JOHN COLLINS-MUHAMMAD** sent a text message that falsely represented to John Doe that Board Bill Number 42 would receive final approval.

> **COLLINS-MUHAMMAD:** "We will be done on Thursday. I'm suspending the rules to move for final perfection. And final passage on the same day. Thursday. This Thursday. Congratulations my brother. Start construction."

31.     On June 15, 2021, **JOHN COLLINS-MUHAMMAD** and John Doe discussed the automobile John Doe had provided to **JOHN COLLINS-MUHAMMAD** in exchange for his continued agreement, assistance, and use of his official position to provide a Tax Abatement for Project A. **COLLINS-MUHAMMAD** told John Doe that the automobile was "perfect," and that he didn't want another vehicle when the Tax Abatement was approved, he wanted to keep that one.

32.     **JOHN COLLINS-MUHAMMAD** had taken legislative action and introduced Board Bill Number 63 on June 25, 2021. Board Bill Number 63 provided Aldermanic approval for redevelopment and Tax Abatement for a significant portion of **JOHN COLLINS-MUHAMMAD's** Ward, including John Doe's Project A property. Board Bill Number 63 was referred by the Board of Aldermen to its HUDZ Committee, and a hearing before that Committee was scheduled for June 30, 2021. On June 30, 2021, HUDZ did hold a hearing on Board Bill Number 63, and **JOHN COLLINS-MUHAMMAD** appeared at the hearing. However, because the mandatory public notice requirements had not been met by **JOHN COLLINS-MUHAMMAD**, Board Bill Number 63 was "held" by the Committee and not voted on, and Board Bill Number 63 did not move through the Board of Aldermen for final approval.

33.     On August 4, 2021, a public official (hereinafter referred to as "Public Official Two") advised John Doe that she had been made aware of Project A in **JOHN COLLINS-**

16

**MUHAMMAD's** Ward, and that she did not support the development. She told John Doe that the residents recently held a community meeting and were strongly opposed to the development as well. Public Official Two told John Doe that, despite her close relationship with **JOHN COLLINS-MUHAMMAD**, she disagreed with **JOHN COLLINS-MUHAMMAD** in his support of the development. Later on that same date, **JOHN COLLINS-MUHAMMAD** sent John Doe a text message advising John Doe that the residents of his Ward were attempting to recall him for supporting Project A.

34.     On August 9, 2021, John Doe spoke with K.W., a close associate of co-defendant Lewis Reed, and requested K.W.'s assistance in getting a meeting with defendant **JOHN COLLINS-MUHAMMAD** and co-defendant Lewis Reed in order to discuss John Doe's ongoing desire to obtain a Tax Abatement for Project A. John Doe's partner in his trucking company, S.M., had previously introduced John Doe to Lewis Reed on January 28, 2021, when Reed was running for Mayor of St. Louis.

35.     On August 26, 2021, a meeting was held at Lewis Reed's campaign headquarters in south St. Louis City. John Doe, Lewis Reed, K.W., and **JOHN COLLINS-MUHAMMAD** attended the meeting. Just before this meeting, **JOHN COLLINS-MUHAMMAD** and Lewis Reed met privately and discussed John Doe's Project A and the promised Tax Abatement. During the larger group meeting, the group discussed John Doe's proposed development and Tax Abatement for Project A. **COLLINS-MUHAMMAD** reinforced his agreement to obtain the Tax Abatement for Project A, and Lewis Reed assured John Doe that he and **COLLINS-MUHAMMAD** would take whatever steps necessary to obtain the Tax Abatement, even promising to override any potential veto placed by the Mayor on the Board Bill providing the Tax

17

Abatement. Both **COLLINS-MUHAMMAD** and Lewis Reed also advised John Doe to slow down construction of Project A in order to give them sufficient time to obtain the promised Tax Abatement. Reed assured John Doe that he and **COLLINS-MUHAMMAD** would do everything necessary to obtain the Tax Abatement.

      36.    On or about September 20, 2021, **JOHN COLLINS-MUHAMMAD** advised Lewis Reed's associate, K.W., by text message: "My plan is to have everything done by the end of October. Sent to HUDZ Committee. So that will be a breeze." K.W. then passed that information to John Doe.

      37.    On September 24, 2021, **JOHN COLLINS-MUHAMMAD** took legislative action and submitted Board Bill Number 99 to the Board of Aldermen. Board Bill Number 99 sought Board approval to blight an area within **JOHN COLLINS-MUHAMMAD's** Ward, including John Doe's Project A property. Board Bill Number 99 was referred by the Board of Aldermen to HUDZ, and a hearing before that Committee was scheduled for October 12, 2021. On September 28, 2021, **JOHN COLLINS-MUHAMMAD** sent a text message to John Doe,

> "I'm here if you need me. Always. Sit tight. You'll be wrapped up in my ward soon....You can count on me."

      38.    On October 12, 2021 HUDZ held a hearing on Board Bill Number 99. **JOHN COLLINS-MUHAMMAD** appeared before the Committee, used his official authority and influence, and spoke in support of his Board Bill Number 99. The Committee approved Board Bill Number 99, and the Bill passed back to the Board of Aldermen for further review.

      39.    On October 15, 2021, Board Bill Number 99 received its second reading before the Board of Aldermen. On October 22, 2021, Board Bill Number 99 received Perfection from the Board of Aldermen, and on October 29, 2021, Board Bill Number 99 received its third reading

before the Board. The Board of Aldermen passed Board Bill Number 99 on October 29, 2021, and Lewis Reed took legislative action and signed the Board Bill and submitted the Board Bill to the Mayor for final approval and signature. Board Bill 99 was issued St. Louis City Ordinance Number 71417 and became effective November 18, 2021.

40.     On October 25, 2021, **JOHN COLLINS-MUHAMMAD** met with John Doe at John Doe's business. **JOHN COLLINS-MUHAMMAD** brought a blank SLDC Tax Abatement Application for Project A, and he filled out the application while at John Doe's business. **JOHN COLLINS-MUHAMMAD** told John Doe that SLDC already had the other required paperwork from the previous Tax Abatement Application that he submitted during January, 2020. **JOHN COLLINS-MUHAMMAD** gave the completed application to John Doe, told him to submit it to the SLDC, and told John Doe that he would call Z.W. at SLDC to discuss the Tax Abatement Application. At the end of this meeting, John Doe gave **JOHN COLLINS-MUHAMMAD** $500 cash in exchange for **JOHN COLLINS-MUHAMMAD's** continued agreement, assistance, and use of his official position to provide a Tax Abatement for Project A.

41.     **JOHN COLLINS-MUHAMMAD** submitted the required redevelopment plan to the LCRA, and on December 14, 2021, the LCRA approved **JOHN COLLINS-MUHAMMAD's** redevelopment plan for the 21st Ward, which included John Doe's Project A.   The redevelopment plan included approval for up to 25 years of tax abatement (10 years of 100% tax abatement followed by 15 years of tax abatement based on 50% of the assessed value of the incremental improvements).

42.     On December 18, 2021, at the request of Lewis Reed, John Doe met with Reed at his campaign headquarters.   Lewis Reed explained to John Doe that residents of **JOHN**

19

**COLLINS-MUHAMMAD's** Ward were attempting to recall him as Alderman by gathering signatures on a petition because of his support for Project A. During the meeting, Reed wrote out a schedule for introduction and passage of the Tax Abatement Board Bill for John Doe's Project A. As Reed gave John Doe the written schedule, John Doe gave Reed $4,000 cash in exchange for his continued agreement, assistance, and use of his official position to provide a Tax Abatement for Project A.

43.     On December 20, 2021, **JOHN COLLINS-MUHAMMAD** used his official authority and influence and sent an email to Z.W. and John Doe via the internet in furtherance of his scheme to support the promised Tax Abatement for John Doe's Project A.

> **COLLINS-MUHAMMAD**: "…[Z.W.], Let's do what we need to do to get this done. In full transparency; I too was under the impression that the board bill I introduced granted tax abatement for this project. I want to get this done ASAP…."

44.     On January 6, 2022, **JOHN COLLINS-MUHAMMAD** sent a text message to John Doe, advising that he would submit the necessary Board Bill to obtain the promised Tax Abatement for Project A.

> **COLLINS-MUHAMMAD**: "We got work to finish. [Z.W.] really got me with the Board bill. I thought we were finished. I have to do another one. Which I have. [Z.W.] prepared it. But we need to finish this for your store. I hate this has taken this long Brother."

45.     On January 11, 2022, **JOHN COLLINS-MUHAMMAD** confirmed to John Doe in a text message that he would introduce the Board Bill to provide a Tax Abatement for John Doe's Project A on Friday, January 14, 2022.

46.     On January 14, 2022, as **JOHN COLLINS-MUHAMMAD** and Lewis Reed had promised, **COLLINS-MUHAMMAD** took legislative action and introduced Board Bill number 152 to the Board of Aldermen to provide a Tax Abatement for John Doe's Project A. The Bill was

referred to co-defendant Jeffrey Boyd's HUDZ Committee for further action and review. On February 22, 2022, Board Bill number 152 was heard in the HUDZ Committee, approved, and sent back to the Board of Aldermen for further review. On February 25, 2022, Board Bill number 152 had its second reading before the Board of Aldermen. On March 4, 2022, Board Bill number 152 was read again before the Board of Aldermen and perfected. On March 11, 2022, Board Bill number 152 was passed by the Board of Aldermen. Lewis Reed took legislative action and signed the Board Bill and submitted the Board Bill to the Mayor for final approval and signature. Board Bill 152 was issued St. Louis City Ordinance Number 71476 and became effective April 30, 2022.

47.     On March 15, 2022, **COLLINS-MUHAMMAD** met with John Doe at John Doe's business. John Doe provided $2,000 cash to **COLLINS-MUHAMMAD** in exchange for his continued agreement, assistance, and use of his official position to provide a Tax Abatement for Project A.

> John Doe: "I got you 2,000 my brother, this is for, you know, the tax abatement thing."
>
> **COLLINS-MUHAMMAD**: "Thank you."
>
> John Doe: "To be honest, it's plenty money saving, you know? So, I really appreciate it, that's great work, John."
>
> **COLLINS-MUHAMMAD**: "I'm here to help, that's the work we're supposed to do."

48.     On March 17, 2022, Lewis Reed met with John Doe at his campaign headquarters. John Doe gave $3,000 cash to Reed in exchange for his continued agreement, assistance, and use of his official position to provide a Tax Abatement for Project A.

> John Doe: "John (**COLLINS-MUHAMMAD**) has just told me, you know, that everything went well, that you signed it (Board Bill 152), you know?"
>
> **REED**: "Yep, yep."

21

John Doe: "And I really appreciate that. That was a great…"

**REED:** "You're welcome."

John Doe: "No problem."

**REED:** "I appreciate you. Thank you. Thank you. And let me know if you need anything."

49.　None of the cash payments and other things of value received by **JOHN COLLINS-MUHAMMAD** from John Doe and referenced above and in the Indictment were reported by **COLLINS-MUHAMMAD** in his reporting to the Missouri Ethics Commission. Similarly, none of the cash payments received by **COLLINS-MUHAMMAD** from John Doe were deposited into a bank account.

50.　In his communications with John Doe and St. Louis City employees, as referenced above and in the Indictment, **JOHN COLLINS-MUHAMMAD** used his cellular telephone to conduct conversations, and to send text messages and email.

51.　The business and transactions related to Project A, as referenced above and in the Indictment, involved something of a value of $5,000 or more.

52.　The parties agree that calculating the potential benefit to be received by John Doe relative to Project A is not possible and, therefore, for purposes of applying U.S.S.G. Section 2C1.1(b)(2), the parties agree that loss should be calculated based upon the value of anything received by defendant **JOHN COLLINS-MUHAMMAD**.

53.　Further, Defendant, **JOHN COLLINS-MUHAMMAD**, admits, acknowledges as true, and accepts responsibility for all of the acts and conduct set forth in paragraphs 11 through 55, and paragraphs 72 through 73 of the Indictment.

22

## 5. STATUTORY PENALTIES:

The defendant fully understands that the maximum possible penalties provided by law for the crimes to which the defendant is pleading guilty are:

As to Count One of the Indictment, imprisonment of not more than 10 years, a fine of not more than $250,000, or both such imprisonment and fine. As to Count Three of the Indictment, imprisonment of not more than 5 years, a fine of not more than $250,000, or both such imprisonment and fine. As to Count Five of the Indictment, imprisonment of not more than 20 years, a fine of not more than $250,000, or both such imprisonment and fine. As to each of the above-referenced Counts, there is also a mandatory $100 Special Assessment and the Court may also impose a period of supervised release of not more than three years.

## 6. U.S. SENTENCING GUIDELINES (2021 MANUAL):

The defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following are the applicable U.S. Sentencing Guidelines Total Offense Level provisions.

### Counts One, Three and Five of the Indictment:

### a. Chapter 2 Offense Conduct:

(1) **Base Offense Level:** The parties agree that the base offense level is 14, as found in Section 2C1.1(a)(1), as defendant was a public official.

(2) **Specific Offense Characteristics:** The parties agree that the following Specific Offense Characteristics apply:

23

It is the Government's position that Two levels are added because the offense involved more than one bribe, pursuant to Section 2C1.1(b)(1). Defendant reserves the right to argue at the time of sentencing that this enhancement does not apply.

The parties agree that Four levels are added because the value received by defendant was more than $15,000 but not more than 40,000, pursuant to Sections 2C1.1(b)(2) and 2B1.1(b)(1)(C).

The parties agree that Four levels are added because the offense involved an elected public official, pursuant to Section 2C1.1(b)(3).

**b.** **Chapter 3 Adjustments:**

**(1)** **Acceptance of Responsibility:** The parties agree that three levels should be deducted pursuant to Section 3E1.1(a) and (b), because the defendant has clearly demonstrated acceptance of responsibility and timely notified the government of the defendant's intention to plead guilty. The parties agree that the defendant's eligibility for this deduction is based upon information presently known. If subsequent to the taking of the guilty plea the government receives new evidence of statements or conduct by the defendant which it believes are inconsistent with defendant's eligibility for this deduction, the government may present said evidence to the court, and argue that the defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement.

**Other Adjustments:** The parties agree that the following additional adjustments apply: None.

24

**Estimated Total Offense Level:** The Government estimates that the Total Offense Level as to each of Counts One, Three, and Five is 21. Defendant reserves the right to argue that the Total Offense Level as to each of Counts One, Three and Five is 19.

**Criminal History:** The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category. The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

**Effect of Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

## 7. WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:

**a. Appeal:** The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

**(1) Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery, the guilty plea, the constitutionality of the statute(s) to which defendant is pleading guilty and whether defendant's conduct falls within the scope of the statute(s).

25

(2) **Sentencing Issues:** In the event the Court accepts the plea, accepts the U.S. Sentencing Guidelines Total Offense Level agreed to herein, and, after determining a Sentencing Guidelines range, sentences the defendant within or below that range, then, as part of this agreement, the defendant hereby waives all rights to appeal all sentencing issues other than Criminal History, but only if it affects the Base Offense Level or Criminal History Category. Similarly, the Government hereby waives all rights to appeal all sentencing issues other than Criminal History, provided the Court accepts the plea, the agreed Total Offense Level and sentences the defendant within or above that range.

**b. Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

**8. OTHER:**

**a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the government.

**b. Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:** Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the defendant.

**c. Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed. These conditions will be restrictions on the defendant to which the defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The defendant understands that parole has been abolished

**d. Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per felony count for a total of $300, which the defendant agrees to pay at the time of sentencing. Money paid by the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

**e. Possibility of Detention:** The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

**f. Fines, Restitution and Costs of Incarceration and Supervision:** The Court may impose a fine, restitution (in addition to any penalty authorized by law), costs of incarceration and costs of supervision. The defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately. Pursuant to Title 18, United States Code, Section 3663A,

27

an order of restitution is mandatory for all crimes listed in Section 3663A(c). Regardless of the Count of conviction, the amount of mandatory restitution imposed shall include all amounts allowed by Section 3663A(b) and the amount of loss agreed to by the parties, including all relevant conduct loss. The defendant agrees to provide full restitution to all victims of all charges in the indictment.

**g. Forfeiture:** The defendant knowingly and voluntarily waives any right, title, and interest in all items seized by law enforcement officials during the course of their investigation, whether or not they are subject to forfeiture, and agrees not to contest the vesting of title of such items in the United States. The defendant agrees to abandon his interest in all seized items and further agrees that said items may be disposed of or destroyed by law enforcement officials in any manner without further notice. By abandoning these items, the defendant waives any future rights to receive additional notice, a valuation of the items, or the opportunity to submit a claim to contest the disposition or destruction of the items that may exist under any policies or procedures of the seizing agency.

## 9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:

In pleading guilty, the defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the government to prove the elements of the offenses against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine

28

adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the government's evidence and discussed the government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the government's case and any defenses.

The guilty plea could impact defendant's immigration status or result in deportation. In particular, if any crime to which defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the defendant of the possible immigration consequences, including deportation, resulting from the plea.

29

## 10. VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:

This document constitutes the entire agreement between the defendant and the government, and no other promises or inducements have been made, directly or indirectly, by any agent of the government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

## 11. CONSEQUENCES OF POST-PLEA MISCONDUCT:

After pleading guilty and before sentencing, if defendant commits any crime, other than minor traffic offenses, violates any condition of release that results in revocation, violates any term of this guilty plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

30

## 12. **NO RIGHT TO WITHDRAW GUILTY PLEA:**

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant
understands that there will be no right to withdraw the plea entered under this agreement, except
where the Court rejects those portions of the plea agreement which deal with charges the
government agrees to dismiss or not to bring.

August 8, 2022
_____
Date

_____
HAL GOLDSMITH
Assistant United States Attorney

July 20, 2022
_____
Date

_____
JOHN COLLINS-MUHAMMAD
Defendant

July, 20, 2022
_____
Date

_____
MATTHEW RADEFELD
JOSEPH FLEES
Attorneys for Defendant

31