UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | )   NO. 4:22 CR 00296 SRC |
| v. | )   NO. 4:22 CR 00297 SRC |
| | ) |
| JOHN COLLINS-MUHAMMAD, | ) |
| LEWIS REED, and | ) |
| JEFFREY BOYD, | ) |
| | ) |
| Defendants. | ) |

### GOVERNMENT'S OMNIBUS SENTENCING MEMORANDUM

Comes now the United States of America, by and through Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, and Hal Goldsmith, Assistant United States Attorney for the Eastern District of Missouri, and for its Omnibus Sentencing Memorandum as to all of the above-referenced Defendants, states to this Honorable Court as follows:

1.  By any standard or measure, each of these Defendants' criminal conduct calls for a significant prison sentence. As to Defendants Collins-Muhammad and Reed, application of the United States Sentencing Guidelines here advise sentences of 37 to 46 months' imprisonment.  As to Defendant Boyd, and his two separate cases, combined application of the United States Sentencing Guidelines here advises a sentence of 30 to 37 months' imprisonment. It is the position of the United States that anything less would ignore the extent of these Defendants' criminal conduct and the substantial harm Defendants' conduct caused to the public.  There are real victims in this case; the citizens of St. Louis who make their homes here or who operate their businesses here, whose taxes paid the salaries of these Defendants, who follow the rules and who have every right to expect their elected officials to follow those same

1

rules, and whose trust in our system of government has been diminished by the criminal acts of these Defendants.

  2. Title 18, United States Code, Section 3553(a) sets out the factors this Court should consider in fashioning an appropriate sentence. The first such factor to be considered is the nature of the offense, 18 U.S.C. 3553(a)(1).  Defendant Lewis Reed was the longtime President of the St. Louis Board of Aldermen, the second highest elected office in the City of St. Louis.  In his position, Reed was also a member of the powerful City Board of Estimate and Apportionment.  Defendant Jeffrey Boyd was the longtime Alderman of the 22nd Ward in the City of St. Louis and, because of his seniority, served as the Vice President of the St. Louis Board of Aldermen.  Boyd also served as the Chairman of the Aldermanic Housing, Urban Development and Zoning Committee, Vice-Chairman of the Aldermanic Legislation Committee, and was a member of several other significant Aldermanic Committees.  John Collins-Muhammad was the Alderman of the 21st Ward in the City of St. Louis, having been first elected during 2017.  Collins-Muhammad served on a number of significant Aldermanic Committees, including Housing, Urban Development and Zoning, Legislation, Public Safety, among others.  The approximately 300,000 residents of St. Louis, and the multitude of individuals who operate businesses in the City, all depended upon the Defendants to do the right thing as their elected officials, and to provide them with their honest services.  Through their continuing criminal conduct these Defendants abused their positions of trust in a substantial and harmful way.  These Defendants placed their own personal interests and political ambitions above all else, and engaged in a myriad of classic illegal "pay to play" schemes in order to fill their own pockets with ill-gotten cash, what is commonly referred to as "walking around money." Defendants' criminal acts were for their own personal gain, and in clear contravention

of the best interests of the public they were elected to serve.

3. This Court need only look to the language of the Grand Jury's Indictments returned in these cases to get a clear picture of the nature and extent of Defendants' criminal conduct. The *verbatim* quoted language from the numerous undercover recordings compiled during the federal investigation provide a real and startling view into the corrupt nature of these Defendants' criminal activities over a 2 ½ year period, from January, 2020 through March, 2022. This case does not present an aberrant view of these Defendants, as their own words captured in these recordings reflect their true nature and characteristics. This case presents a picture of greed, pure and simple. These Defendants sold their elected offices in exchange for cash bribes, campaign donations, and other things of value with total disregard for the best interests of their constituents, the real victims in this case. Those illegal cash bribes went right into their pockets, not into traceable bank accounts, and were further concealed by each Defendants' failure to report the cash on their Missouri ethics reports and on their federal and state income tax returns.

4. In this case, we need also look at the type of "official acts" committed by Defendants. We are not talking about engaging in a simple phone call, or convening a meeting, or directing a subordinate to take some isolated action. Each of these three Defendants took multiple substantial steps in their official positions to assist "John Doe" in their various "pay to play" schemes. They provided John Doe with their Aldermanic support in multiple dealings with representatives of the St. Louis Development Corporation and the City's Land Reutilization Authority. They sponsored and supported multiple Board Bills before the St. Louis Board of Aldermen, and ushered those Bills through the various Aldermanic Committees. They signed the final Board Bills, which ultimately were unwittingly signed off by the Mayor of St. Louis as official City Ordinances allowing for the requested Tax Abatements. And these Defendants

3

committed those multiple official acts while accepting streams of cash bribes, campaign donations, and other things of value in exchange. By all accounts, the multiple official acts committed by these Defendants were significant and substantial, and had the potential to reduce sales income and the property taxes which would have ultimately flowed to the City relative to the properties involved in their schemes.

     5.     This Court is also to consider the histories and characteristics of the Defendants in fashioning appropriate sentences, 18 U.S.C. 3553(a)(1). As to these Defendants' histories and characteristics, one might look to the moment when Special Agents of the FBI knocked on their doors during May, 2022. At that time, all three of these Defendants lied to the Agents, falsely denying having accepted the cash bribes, and falsely denying having provided any favorable legislative action in exchange. Boyd also lied about the insurance fraud, initially telling the Agents that he had actually purchased and owned the damaged automobiles which were the subject of his false insurance claim. Only after being confronted by the Agents with the irrefutable evidence contained within the undercover photographs and recordings did these Defendants acknowledge their criminal conduct. Apparently, in the minds of these Defendants, if there are no pictures or recordings, there is no crime to admit. That is particularly troubling, especially when considering that two of these Defendants, Reed and Boyd, had each served in elected office for more than twenty years and held top ranking positions on the Board of Aldermen.

     6.     As to the histories and characteristics of these Defendants, one can also look to the first time each of these Defendants accepted a cash bribe from John Doe. Consistent with their acceptance of all the later cash bribes, these undercover recordings reveal the truth, that none of these Defendants had any concern about taking the cash, it was simply business as usual:

  A. Defendant John Collins-Muhammad on January 24, 2020, after providing John Doe his Aldermanic Letter of Support for a Tax Abatement:

> **John Doe:** "What I owe you for this?"
>
> **Collins-Muhammad:** "25."
>
>     \*\*\*
>
> **John Doe:** [after providing Collins-Muhammad $2500 cash] "I really appreciate it, my man."
>
> **Collins-Muhammad:** "No problem at all."
>
>     \*\*\*
>
> **Collins-Muhammad:** "That's our job as an Alderman, we're supposed to help out business owners."

Recall also that when Defendant Collins-Muhammad introduced John Doe to "Public Official One," Collins-Muhammad advised Doe that he should be prepared to pay a $10,000 cash bribe in order to obtain the requested trucking contracts:

> **John Doe:** "Should I throw him something?"
>
> **Collins-Muhammad:** "Fuck yeah, you should throw him something.  Yeah, you should throw him something."
>
> **John Doe:** "OK."
>
> **Collins-Muhammad:** "If you don't throw him something, he'll never come back."

That is evidence of a course of conduct, not aberrant "one off" behavior.  This point was further evidenced when Defendant Collins-Muhammad introduced John Doe to Defendant Boyd, and gave John Doe advice on how much of a cash bribe he should pay to Boyd:

> **John Doe:** "How much (cash) should I bring him?"
>
> **Collins-Muhammad:** "Wait first, let's let's uh…20…2,000?  25?

5

> **John Doe:** "2,000?  2,500?"
>
> **Collins-Muhammad:** "No.  Yeah, yeah, 2,000, you can give him 2,500.  That or 3.  2,000 would be good."

In addition to paying these bribes to Public Official One and Defendant Boyd, John Doe also gave Defendant Collins-Muhammad cash bribes for setting up the meetings, which Collins-Muhammad readily accepted.

  B. Defendant Lewis Reed on August 26, 2021, when agreeing to provide his assistance to John Doe in obtaining a tax abatement for Project A, and accepting a $1,000 cash bribe:

> **Reed:** "[John Doe], you've got our support, so we'll get things done for you."
>
> **John Doe:** "Appreciate it."
>
> **Reed:** "You're welcome.  If you need us for anything, let us know….Let me know anything, anything you need, you know we got you, we got you."

Of course, Defendant Reed had previously accepted substantial bribes from John Doe earlier during 2021 relative to Reed's agreement to assist John Doe in obtaining City trucking and hauling contracts.

  C. Defendant Jeffrey Boyd on July 25, 2020, when first meeting John Doe and agreeing to provide his assistance to John Doe in obtaining a City owned property in his Ward at a substantially reduced price, and accepting a $2,500 cash bribe:

> **John Doe:** "So, I'll bid like 7, $8,000?  $10,000?  I'll give you my company's information, and you can…."
>
> **Boyd:** "Yeah, just send me an email and say, 'Hey, look, I'm going to be applying for this, this is what I want to do and blah, blah, blah.'  And then, I'll take what you give me and I'll do a Letter of Support.  Say I support blah, blah, blah, blah, blah and all that."
>
> **John Doe:** "OK."

Defendants' ready acceptance of these initial cash bribes, as reflected in the undercover recordings, suggests that such a practice was second nature to each of them, and gives this Court a better understanding of their history and characteristics.  By way of further illustration, the United States has attached as Government Exhibit 1 hereto a series of date stamped images taken from undercover video recordings which clearly reflect the ease with which each of these Defendants took cash bribes relative to their various "pay to play" schemes.

      April 26, 2021,  Defendant Boyd;

      May 6, 2021,  Defendant Reed;

      May 12, 2021,  Defendant Collins-Muhammad;

      July 3, 2021,  Defendant Reed;

      December 14, 2021,  Defendant Boyd;

      December 18, 2021, Defendant Reed;

      February 18, 2022,  Defendant Boyd:

      March 15, 2022,  Defendant Collins-Muhammad.

      7.    This Court should also consider the unrelated criminal scheme carried out by Defendant Boyd in his effort to defraud his own car dealership's insurance carrier.  That crime clearly reveals Defendant Boyd's true self, a schemer looking for any way to make a dollar, even if it entailed violating the law for his own personal gain.  As the recordings and email communications reflect, the fact that Defendant Boyd became agitated with what he perceived to be the insurance company's slow processing of his claim reveals his total lack of concern that his claim was in all respects, *false*.  In order to get the insurance company to process his claim quicker, Defendant Boyd actually doubled down on his fraud, and falsely represented that he was incurring daily storage fees for the damaged automobiles.  That is a level of audacity and

greed in his criminal conduct that should not be overlooked by this Court.

      8.      This Court's sentence should also afford adequate deterrence to criminal conduct, 18 U.S.C. 3553(a)(2)(B). These Defendants were duly elected members of the St. Louis Board of Aldermen. As President of the Board of Aldermen, Defendant Reed was charged with overseeing the operations of that legislative body on behalf of the City's residents. He, along with the Mayor and the Comptroller, also served on the City's Board of Estimate and Apportionment, making decisions on how the City's funds would be used. Defendant Boyd, Vice-President of the Board of Aldermen, served as the Chairman of the Aldermanic Housing, Urban Development and Zoning Committee, while also serving his constituents in the 22nd Ward. Defendant Collins-Muhammad served on a number of important Aldermanic subcommittees, while also serving his constituents in the 21st Ward. In their various elected offices, as demonstrated by their actions in this case, in addition to exercising substantial influence and control within the Board of Aldermen, Defendants also exercised considerable authority and influence over the City's agencies and employees, including the St. Louis Development Corporation and the St. Louis Land Reutilization Authority. This Court should fashion a significant punishment not only to deter these Defendants from future criminal conduct, but in order to deter other individuals in similar governmental positions from committing similar crimes. Unfortunately, there have been a number of elected officials in the St. Louis metropolitan area who have been convicted of public corruption crimes in the past several years. St. Louis County Executive Steve Stenger was sentenced by District Court Judge Perry to serve a 46 month sentence for accepting illegal bribes in the form of campaign donations. Missouri State Representative T.D. El Amin was sentenced by District Court Judge Autrey to serve an 18 month sentence for accepting an illegal bribe of $2,100. Pine Lawn,

Missouri Mayor Sylvester Caldwell was sentenced by District Court Judge Perry to serve a 33 month sentence for accepting illegal bribes totaling $5,500.  Missouri State Representative Courtney Curtis was sentenced by this Court to serve a 21 month sentence for stealing campaign funds, and St. Louis Alderman Larry Arnowitz was sentenced by this Court to serve an 18 month sentence for similar criminal conduct.  All of these above-referenced sentences were within the sentencing guideline ranges established by the United States Sentencing Commission.  In the instant case, the United States submits that prison sentences within the applicable sentencing guideline ranges will have the required deterrent effect.

9.      Each of the Defendants in the instant case resigned their positions on the Board of Aldermen.  Defendant Collins-Muhammad did so upon learning of the federal investigation, and Defendants Reed and Boyd did so shortly after their first appearances in Court to answer to the charges against them.  Defendants have been awarded acceptance of responsibility under the United States Sentencing Guidelines in this case as a result of their guilty pleas.  The fact that they resigned their elected positions should not be the basis for any further sentencing benefit in this case.  In a public corruption case such as this, removal from public office or resignation from one's elected position is the ordinary and inevitable result.  There is nothing extraordinary about Defendants' actions in this regard.  Any suggestion by Defendants that their resignations from elected office should inure to their benefit at sentencing should be rejected by this Court.  Instead, this Court should hold these Defendants to a higher standard of conduct precisely because of their public positions.  If the Court were to consider these collateral consequences in framing more lenient sentences, it would be tantamount to favoring criminals with privileged backgrounds.  Furthermore, the fact that these Defendants, as elected officials, are first time offenders is typical as well, and has already been taken into consideration by the Sentencing

9

Commission in the applicable sentencing guidelines. Such a fact is not extraordinary in these types of white collar criminal cases, and should not form the basis for lesser sentences under the circumstances presented here.[1]

10. The United States submits that there is no basis in the law or the underlying facts and circumstances here that would justify downward variances to sentences less than the advisory guideline sentences. It is the United States' position that justice and fairness require significant sentences of imprisonment in these cases. As a direct result of these three Defendants' criminal conduct, the adverse impact upon the City of St. Louis and its residents who rely upon their elected officials to perform their jobs honorably and with integrity has been substantial. This is *not* a victimless crime. Our public officials should be held accountable for their criminal conduct by appropriate prison sentences; the victim citizens deserve it, and fairness and justice require it.

11. In fashioning an appropriate sentence here, this Court needs to have a full and clear understanding of the adverse impact Defendants' criminal conduct has had on the residents of the City of St. Louis and on St. Louis City Government. Attached as Government Exhibit 2 hereto is a compilation of public statements made by various elected officials and political organizations, as well as citizen victim impact statements which articulate in a way that the undersigned cannot the truly substantial and harmful impact that Defendants' criminal conduct had upon these individuals and entities. It is difficult, if not impossible, to measure the loss of trust in its leaders by the citizens of the City of St. Louis as a result of Defendants' crimes.

12. Only significant prison sentences will adequately reflect the seriousness of the

---

[1] There is no question that Defendants' families have suffered and will continue to suffer as a consequence of Defendants' criminal conduct here. However, the risk that such a consequence would fall upon their families was Defendants' to appreciate and avoid, and they should not now be heard to seek the leniency of this Court because their own criminal conduct has caused such harm.

offenses, promote respect for the law, and provide just punishment for Defendants' criminal offenses as is required by 18 U.S.C. 3553(a)(2)(A). After all, public service is a public trust. These three Defendants broke that trust here and should be justly punished.

WHEREFORE, the United States of America prays that this Honorable Court sentence Defendants to appropriate terms of imprisonment within the advisory guideline ranges, without downward variances, and for such other relief as this Court deems appropriate and just under the circumstances.

Respectfully submitted,

SAYLER A. FLEMING
United States attorney

*s/ Hal Goldsmith*
HAL GOLDSMITH #32984
Assistant United States Attorney
111S. 10th Street, Room 20.331 St. Louis, Missouri 63102
(314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the defendant's counsel of record.

*/s/ Hal Goldsmith*
HALGOLDSMITH
Assistant United States Attorney