**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,                    ) | |
| Plaintiff,                    ) | |
| ) | Cause No. 4:22-CR-00297 SRC |
| v.                    ) | |
| JOHN COLLINS-MUHAMMAD,                    ) | |
| Defendant.                    ) | |

### DEFENDANT JOHN COLLINS-MUHAMMAD'S
### SENTENCING MEMORANDUM

Defendant John Collins-Muhammad, through counsel, respectfully requests this Court sentence him to concurrent terms of five years probation with community service. In support of this request, Defendant submits the following**:**

*From Alderman to Amazon*

In April of 2017, John Collins-Muhammad (hereinafter "John") was elected as Alderman for the City of St. Louis' 21st Ward. He was twenty-five years old, one of the youngest Alderman in the City's history. He was also the City's first Muslim Alderman. This was a dream come true for John as he had a passion for community service and politics.

John grew up in North City and was surrounded by drugs and violent crime. He wanted nothing to do with that lifestyle because it cost him his mother and father. The family that raised John taught him to resist the crime and violence around him, care about his community and to give back. John took this to heart and aspired to be and do more.

John wanted to be Mayor of the City of St. Louis, a U.S. Representative, or a U.S. Senator. Alderman was a steppingstone to higher office. He was being "groomed" by many community leaders to be the next big thing in St. Louis politics. But he was only twenty-five years old holding

an office that wielded significant power and influence. He was twenty-eight years old when he became involved with John Doe in Project A and temptation got the better of him. John had turned away from drugs and gangs, but still fell prey to the promise of fast cash.

Now, John works in an Amazon warehouse and for a local retailer. He makes a little above minimum wage so he must work multiple jobs to support his wife and dependents. To go from rising star and community leader to an entry-level warehouse worker was quite a change in circumstance. John now sees that this is the price of greed.

But John is more than his offense. John is a survivor of a hard upbringing. He is a husband and a father. John has served the community and brought positive change to his ward and the City of St. Louis as a whole. John asks the Court to look beyond the headlines and consider all aspects of his character and life when weighing its decision. He is a person who is worthy of a chance at redemption. The requested sentence meets the goals of 3553(a) and is a just result.

*The Relevant 3553(a) Factors for Consideration*

**1.     The nature and circumstances of the offense and the history and characteristics of the defendant.**

A.     *The nature and circumstances of the offense.*

There is no excuse for John's conduct. Bribery of public officials erodes public trust, which in turn erodes democracy. The irony of what John did was that had John Doe came to him to request support for Project A free of any strings, John would have supported it. John felt the 21st Ward needed more business, and the goods and services provided by a gas station would have been a benefit to his constituents. Many residents expressed support for John Doe and his businesses. Project A will likely continue to be developed. Therefore, unlike other bribery schemes that create waste through unneeded government projects, Project A was otherwise legitimate.

One of the problems with the bribery scheme here is the lack of transparency.  Had John Doe donated to John's ongoing campaign and structured those donations across multiple sources including himself, his business, and family members; and had those donations met certain contribution limits per individual source, then the payments would have been legal.  Politicians accept money from donors in this fashion every day.  The difference is that campaign contributions (allegedly) have no explicit requests tied to the donation, and more importantly, are a matter of public record.

Another important aspect of the offense is that John did not solicit these bribes directly.  He was approached by John Doe at the behest of the Federal Bureau of Investigation (FBI) and asked to support the project.  After John Doe and John started work, John Doe asked "how much do I owe?"  Had John said "nothing," he would not be here.  At each interval, John Doe offered money and John accepted, but there was no exact "demand" for payment from John.  John did accept the money and for that he must be punished.  But it is worth noting that John did not start out soliciting bribes from John Doe.  The bribes were offered.  A small distinction but it should have some weight when determining the sentence.

It may also be said that John was some kind of "super-spreader" in that he got the co-defendants involved, as if he "coaxed" the others in some way.  But John's co-defendants were senior to him in the political hierarchy.  As mentioned, he was twenty-eight years old.  They could have said no and stopped John.  As senior leaders, John looked up to them as mentors.  That is why he came to them.  In the process John unwittingly helped uncover corruption in the City, and the City is better off for it.

The last point about the offense is how John spent the money.  It did not go to luxury.  John made very little as an Alderman.  The money was used to pay bills and expenses to support his

family. Some money was used to assist people in his ward with their bills, as John was known for being generous to those in need. He has assisted elderly and single parent constituents when he could spare it. He did use most of the bribe money for his benefit, but only to support his family with their needs. Here again this is no excuse. But it is worth noting this is not an individual living a lavish lifestyle while his constituents suffer. John too is poor.

Nevertheless, he must be punished for his crimes. But the Defense respectfully requests the Court consider the nature of the offense here when compared with other bribery offenses where there is great expense to the government, government waste, multiple source bribes, and other factors that are not present here.[1]

B.   *The history and characteristics of the defendant.*

i.   *John's background.*

John had an atypical childhood filled with hardship. He did not know his mother. John only knew her as April and did not know her last name until it was revealed in the Presentence Investigation Report (PSR). When he was an infant, his mother had a terrible drug problem. She could not afford her habit and owed a lot of bad people money. One of these individuals decided to motivate her repayment by kidnapping John and his twin sister Jasmine, and held them as collateral. The children were approximately twelve months old at the time.

When John's father, John Sr., found out his children had been kidnapped and were being held hostage, he located the drug dealer and killed him. John Sr. thought he was protecting his family. For this he received a life sentence. John's mother abandoned him and his sisters a short time later.

---

[1] *See United States v. Steve Stenger*, 4:19-CR00312 CDP (EDMO) (County Executive of largest county in the State of Missouri found to be providing political contracts in pay-to-play scheme at expense to taxpayers of $130,000).

John grew up angry. He blamed his mother's refusal to get clean for his father's incarceration. His father's family took in the children, so they ensured he had a relationship with his father even though he was behind bars. John and his father became "best friends." He would visit as often as possible, and the two corresponded in letters. John did harbor some anger towards his father though. Not because he killed a man and was incarcerated, but because when John would visit, he would lie to him about when he was coming home. John Sr. would often say he would be home "soon." John knew this was a lie and it deeply upset him, though as an adult John has come to realize that his father was likely lying to himself because coming home "soon" was the only hope he had to make it through daily prison life. Unfortunately, John Sr. never made it home. He died of a heart attack in prison not long before he was eligible for parole. For John, the loss of his father was devastating. It sent him into a deep depression, one in which he has never really recovered.

Because of the loss of his parents, John was raised by his grandmother until she died in 2002. Then, John was adopted by his aunt Linda and his cousin LaTonia Collins Smith. These women raised him. He calls LaTonia "mom." The community knows LaTonia as Dr. LaTonia Collins Smith, President of Harris-Stowe State University. Linda and Dr. Collins Smith raised John in a loving environment, despite the hardships of growing up in North City. They instilled a sense of self-empowerment and community service in John and his siblings. John went on to be an Alderman, and his youngest sister is a state representative. This is a family of community leaders. This makes John even more aware of his failure. He failed not only the people of St. Louis, but his family as well.

Aside from these remarkable women who raised him, John's family includes his wife, Asia, and their children. The family is blended, as John and Asia not only have a child together but have

5

children from prior relationships they are raising together. John's greatest fear is that he will be sentenced to prison and his family will be broken apart with Asia being left responsible for maintaining the entire household.

In their home, there are four children. John shares custody of his oldest son with the child's mother. John fears he will lose custody of him if incarcerated because his son will return to his mother's fulltime care. He and Asia have a son together, and John has a daughter from a prior relationship who resides with them. Asia has two other children from a previous relationship that John helps care for. These children look to him as a father. So, while the PSR reflects he has three legal dependents, the reality is that he has five. All five of them, along with his wife, look to John for financial support.

Growing up visiting his own father in prison, John feared ending up in the same place. He never wanted his kids visiting him in prison, with him telling them he would be home "soon." Now, because of his actions, it may come true anyway. But John's family is what gets him through the day. It is for them that he works two jobs and keeps struggling. He has not given up and will not. This family support is significant when assessing a person's rehabilitative potential. For these reasons, John asks the Court to consider his background when considering the sentence.[2]

ii.     *Good works as Alderman for the 21st Ward.*

John's service to the 21st Ward and City of St. Louis is tainted by this offense, but he did perform numerous good works while Alderman that should be considered on balance. He worked

---

[2] The PSR reflects that these reasons may support a reason for variance. *See* PSR, Doc. # 84, paragraph 152.

It is also worth noting that John has no significant criminal history. He does have numerous traffic offenses. Since his arrest on this offense, John has worked to resolve all these matters. Most are now closed, and he is on payment plans with various municipal courts. None are in warrant status. John will continue to work to resolve all of these and pay his fines and costs to the various municipalities.

to pass ordinances and policies that would contribute to the rebuilding and rebranding of North City and the betterment of the city as a whole.

John's focus as Alderman was on economic development and community safety. One of his first acts was the proposed redevelopment plan for Natural Bridge Avenue, one of the main corridors in North City. The goal was to transform Natural Bridge as an attraction for commercial, retail and business development. He was quoted as saying he wanted Natural Bridge to "look like the Delmar Loop." Due to initiatives spearheaded by him, there have been eight million dollars out into commercial construction on the Natural Bridge corridor.

The initiative also worked to reduce vehicular fatalities on Natural Bridge Avenue, a problem that had plagued the roadway. John helped launch a six million dollars initiative to make improvements along the Natural Bridge corridor within the city limits, including driving surface repairs and several major improvements to enhance safety. Since the roadway reconfiguration there have been no vehicular fatalities on Natural Bridge, a road that has seen over a hundred fatalities in the last ten years.

Removing blight and redevelopment was also a priority. One area where John's work can be seen is in the redevelopment of O'Fallon Park and the O'Fallon Park Boathouse. O'Fallon Park is the third largest park in the City of St. Louis. The park had become run down, and the historic boathouse needed repair. John wanted the park to be an attraction so he met with youth in the area and asked how they could make the park a recreational destination. He kept hearing about the amenities of Forest Park. John asked, "How can we make O'Fallon Park our own Forest Park?" Using community feedback, John focused on repairing the boathouse, creating a basketball court, and using children to create art designs. He secured a two million dollar redevelopment. Today, O'Fallon Park is a community hub that compliments the neighboring YMCA Recreational Center.

7

In addition to the O'Fallon Park redevelopment, John led initiatives to remove nearly 600 derelict buildings, cracked down on nuisance properties, and worked with other property owners to bring properties back up to code.  John helped to pass legislation creating the Dollar Housing Program, enabling people to purchase vacant city-owned property for one dollar in the interest of developing economically struggling communities.

In addition to redevelopment, John's focus also included an emphasis on assisting the people in the community.  Even though he was Muslim, John worked closely with St. Peter AME Church to provide services to those in the community he served.  The focus of his partnership with St. Peter was the homeless.  This is an area where John did not lobby or pass legislation, he simply helped.  St. Peter opened its doors to the homeless, and at one point had over one hundred people staying there.  Women, children, the elderly all came to St Peter.  The people needed food and supplies.  John used his influence to get assistance from the Urban League, Catholic Charities, and the Metrolink.  John worked in the soup kitchen and drove families to get services they needed.  He volunteered time and donated money to assist the homeless in his ward.

John passed an ordinance creating a Disconnected Youth Task Force to study the obstacles to youth found to be lacking education, training and employment.  His goal was to ensure young people had access to opportunities so that they did not turn to crime or drug abuse and could be successful in life.

John was influential with the "Ban the Box" initiative, prohibiting all employers in the City of St. Louis from basing job hiring or promotion decisions on applicants' criminal history.  He felt a person's past should not impact their future potential.  This is ironic considering he is now a convicted felon.  He only hopes he will be given the same chance at a fresh start someday.

8

John touched so many lives with his work as Alderman. He was very active and was a true community leader. This is reflected in the numerous character letters that have been provided to the Court to review.[3] In Dr. Martin Luther King's book *The Measure of a Man*, Dr. King speaks about how one of the ways one can tell the character of a person is by how others speak of them. John has had numerous people, representing a large cross-section of the public, speak on his behalf. Community leaders, activists, and regular people who John has helped have submitted letters of support. The letters all speak of a man who was a servant of the people. While his service is marred by this scheme, other than Project A, John was a positive force. He humbly asks the Court to consider this when determining its sentence.

**2.     The need for the sentence imposed to reflect the seriousness of the offense and provide punishment and deterrence, balanced against the need for rehabilitation.**

Given the number of eyes on this case, it will be important for the Court to send the right message, both to John and the community. But a lengthy prison is not needed to meet the objectives of 3553(a). When assessing punishment, Counsel contends that John's punishment began the day he resigned from office in disgrace. His resignation drew a large amount of media attention and public scrutiny. He was no longer a rising star, but now a pariah. The public humiliation was intense.

As stated, John went from Alderman to Amazon overnight. Any political aspirations he had, his boyhood dreams, were instantly gone. He will never serve the public as a leader again. He will never be able to obtain that kind of trust. For John, this is punishment. The public shaming is punishment. His children will forever associate their father with his failure. Thanks to the

---

[3] *See* attached character letters provided as exhibits.

internet, when they Google their father, they will see countless articles about his misdeeds, and those articles will last in perpetuity. This is punishment.

Many judges have commented that a key aspect of sentencing is ensuring that the defendant "gets it." In this regard, John will not be back before the Court again. He has no history of committing serious criminal offenses. But more importantly, this is a crime where recidivism is not a real concern. There are no repeat bribery offenders. John will never hold an office where that can happen, nor would it even if he could. To the extent the punishment needs to deter future misconduct, there are no concerns John will return as it is unlikely he will commit other crimes. John has done well on pretrial release, with no violations. This is evidence he would do well on probation and comply with all directives.

Another aspect of ensuring a defendant "gets it," is making sure they understand the severity of their offense. Here, John has shown shame and remorse. Saying sorry is an act you do to get past something, but shame and remorse are felt and demonstrated. Counsel would ask the Court to review John's letter to the Court.[4] This is an individual who understands his offense, and the consequences on the community. With true shame and remorse there can be meaningful rehabilitation.

Given John's lack of significant criminal history, his upbringing, and his history of good works he possesses a great deal of rehabilitative potential. A sentence of incarceration is not necessary to punish him given the punishments he has and is facing. Justice should be measured by more than just months in prison. Incarceration is not necessary given John's tremendous rehabilitative potential, and a non-incarceratory sentence would best assist him in rehabilitation.[5]

---

[4] Attached as an exhibit.
[5] Research indicates that rehabilitative services are best delivered within a community setting. *See* Washington State Institute for Public Policy: Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates (October 2006) (finding rehabilitative services delivered in non-custodial settings

### 3. The kinds of sentences available and the need to avoid unwarranted sentencing disparities.

The U.S. Sentencing Commission maintains data on bribery offenses to assist Courts in assessing sentencing. According to the U.S. Sentencing Commission, using data from Fiscal Year 2021, approximately 26 percent of bribery offenders are sentenced to probation.[6] The average age of the offender was 49 years old, and for those being sentenced to prison the average sentence was 23 months.[7] Approximately 45 percent received a variance.[8] The median loss for the offense was $52,328.[9]

In addition to the Sentencing Commission data, the Federal Judiciary Sentencing Information (JSIN) offers some insight. According to JSIN, the average and median length sentence for an individual sentenced under Guideline §2C1.1 with a criminal history category I between FY2017-FY2021 is 27 months.[10] Therefore, even if the Court were to give a prison sentence, to avoid a gross sentencing disparity, John should at least receive a downward variance of 23-27 months. This is particularly true considering not only the 3553(a) factors addressed above, but also John's young age and the considerably lower loss amount relative to other offenders.

---

reduce recidivism rates at greater rates than do services delivered in custodial settings); *see also* Bruce P. Archibald, Let My People Go: Human Capital Investment And Community Capacity Building via Meta/Regulation in a Deliberative Democracy–A Modest Contribution for Criminal Law and Restorative Justice, 16 Cardozo J. Int'l & Comp. L. 1 at 79 (2011) (noting imprisonment isolates offenders from regular social interactions, inhibits their capacity to interact positively with well-integrated members of society, and disrupts family relationships).

[6] *See* U.S. Sentencing Commission Quick Facts on Bribery, available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Bribery_FY21.pdf (last visited Nov. 25. 2022)
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *See* JSIN data available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard

11

In sum, this data demonstrates that downward variances are appropriate, and probation may be appropriate in certain cases. Counsel contends for a young offender like John whose loss is significantly lower than the median loss, he should be considered for not only a downward variance but also probation.

**4.      Restitution and Ability to Pay Fines and Certain Costs.**

The FBI has made a restitution request in this case. Defense Counsel has made legal objections to this request that are contained in Doc. # 86. The only additional point to make here is that the media has sensationalized the objections by claiming that John "does not want to repay" the money. The objections did not state that John did not want to pay it back or that he was "not sorry" as some have claimed. The objection simply says that the PSR cites the wrong statute and the caselaw says the FBI cannot recover "restitution" as a "victim" pursuant to the statute cited.

If the Court were to look at the alternative method of repayment under either 18 U.S.C. § 3572(a)(5) as a fine, or 18 U.S.C. § 3583(d) as a condition of supervised release, then the Court must assess John's ability to pay pursuant to that statute. The initial disclosure PSR found that based on John's current financial condition it did not appear that John had the ability to pay a fine.[11] The revised PSR, using the same data, reversed that position and said that John does have the ability to pay at least the minimum fine as required by the guideline range in installment payments."[12]

What is missing from the Final PSR is a projection of whether John would still have the ability to pay the minimum fine if he is sentenced to prison and his salary (which accounts of seventy-five percent of the household income) drops to zero dollars. If the Court sentences John

---

[11] *See* PSR, Doc. # 86, paragraph 130.
[12] *See* Final PSR Doc. #98, paragraph 129. (still finding Defendant has negative net worth and negative net monthly cash flow).

to prison, he will be indigent.  The "need to deprive the defendant of illegally obtained gains from the offense" found in 18 U.S.C. § 3572(a)(5) should be balanced against other considerations including whether John can actually pay it.  The money is spent so he cannot be deprived of illegally obtained gains he no longer possesses.  Supervised release should set him up for success, not set unrealistic expectations.[13]

Therefore, while John may wish to be able to repay the money, he simply cannot without great personal hardship to him and his family.  Defense asks the Court to consider the punishment John is receiving is sufficient to compensate for this loss to the Government, an expenditure the Government chose to make in an effort to ferret out criminal activity.

*Conclusion*

A sentence of probation, combined with community service, punishes, deters, and focuses on rehabilitation.  Community service is appropriate because it allows John to utilize his best talents to assist others in need.

As founder of the Equal Justice Initiative Bryan Stevenson once said, "each person is more than the worst thing they've ever done."  John is no exception to this principle.  Mr. Stevenson also wrote that a measure of character is how one treats "the poor, the disfavored, the accused, the incarcerated, and the condemned."  As Alderman, John strove to reach as many of these groups as he could and served as their advocate.  His mission was to ensure every single person in the City of St. Louis had economic access, to develop North City, to rid the community of blight, and to improve the criminal justice system.  Because of his actions, his work will go unfinished by him, and will instead fall to others.  But he laid a foundation and left a positive lasting impact on the

---

[13] The Final PSR also doesn't reflect that John is making payments towards approximately $2,000 in fines and court costs on his municipal court cases reflected in the PSR.  Those payments will continue following sentencing in this matter and should be accounted for when considering expenses.

13

21st Ward as evidenced by the letters of support he received. John simply asks that the Court judge him with consideration of the good and the bad, and a recognition he has done more good than harm.

WHEREFORE, for the reasons stated herein, Defendant prays this Honorable Court sentence Defendant to concurrent terms of five years probation with community service which is a sentence that is "sufficient but not greater than necessary" to serve the purposes of sentencing set forth in 18 U.S.C. §3553(a).

Respectfully submitted,

FRANK, JUENGEL & RADEFELD,
ATTORNEYS AT LAW, P.C.


By */s/ Joseph W. Flees*
JOSEPH W. FLEES (#60872MO)
Counsel for Defendant
7710 Carondelet Avenue, Suite 350
Clayton, Missouri 63105
(314) 725-7777
jflees@fjrdefense.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following.

Hal Goldsmith
Asst. United States Attorney
111 South Tenth Street, 20th Floor
St. Louis, Missouri, 63102

*/s/ Joseph W. Flees*
JOSEPH W. FLEES
